UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| Allie James, on behalf of D.P., a minor, | ) ) ) |
| Plaintiff, | ) Civil Action No. 9:12-2694-RMG ) ) |
| vs. | ) ) |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | ) ) **ORDER** ) |
| Defendant. | ) ) ) |

This matter comes before the Court on an appeal by Plaintiff, a minor child, from the final decision of the Commissioner of Social Security denying him Supplemental Security Income ("SSI") benefits under the Social Security Act. In accord with 28 U.S.C. § 636(b) and Local Civil Rule 73.02 DSC, this matter was referred to the Magistrate Judge for pretrial handling. The Magistrate Judge issued a Report and Recommendation ("R & R") on November 12, 2013, recommending that the Commissioner's decision be affirmed. (Dkt. No. 14). Plaintiff timely filed objections to the R & R and the Commissioner filed a reply. (Dkt. Nos. 18, 19). As set forth more fully below, the Court reverses the decision of the Commissioner and remands the matter to the agency to take further action consistent with this order.

**Legal Standard**

The Magistrate Judge makes only a recommendation to this Court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with this Court. *Mathews v. Weber*, 423 U.S. 261 (1976). The Court is charged with making a *de novo* determination of those portions of the R & R to which specific objection has been made. The

Court may accept, reject, or modify, in whole or in part, the recommendation of the Magistrate Judge. 28 U.S.C. § 636(b)(1).

The role of the federal judiciary in the administrative scheme of the Social Security Act is a limited one. The Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence has been defined as "more than a scintilla but less than preponderance." *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes *de novo* review of factual findings that substitutes the Court's findings for the Commissioner's. *Vitek v. Finch*, 438 F.2d 1157, 1157 (4th Cir. 1971).

Although the district court's review role in Social Security appeals is a limited one, "it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). The courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure there is a sound foundation for the [Commissioner's] findings. *Vitek v. Finch*, 438 F.2d at 1157-58. Further, the Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir. 1987).

A child is considered disabled under the Social Security Act if he has a medically determinable physical or mental impairment which can be expected to either cause death or last continuously for at least twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i). The Commissioner is mandated to engage in a three-step process in adjudicating the claim of a child under the Social Security Act. At Step One, the Commissioner must determine if the child is engaged in

substantial gainful activity. If the child is engaged in substantial gainful activity, he is not disabled. 20 C.F.R. § 416.924(b). If the child is not engaged in substantial gainful activity, the Commissioner must address at Step Two whether the child has one or more medically determinable impairments that are severe. *Id.* § 416.924(c). A severe impairment under the regulation is one which is more than a slight impairment that causes more than minimal functional limitations. *Id.* If the child has no severe impairment, he is not disabled. However, if the child has one or more severe impairments, the Commissioner must proceed to Step Three to determine whether an impairment or a combination of impairments meets or is the medical or functional equivalent of a Listing set forth at 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* § 416.924(d). In determining whether a child meets the functional equivalent equal to a Listing, the Commissioner should consider the child's level of function in six areas: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating to others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well being. A child must be shown to have a "marked" impairment in at least two of the functional areas to be found to be disabled under the Act under a functional equivalency analysis. *Id.* § 416.926a.

Under the regulations of the Social Security Administration, the Commissioner is obligated to consider all medical evidence and the opinions of all medical sources. *Id.* § 404.1545. Additionally 20 C.F.R. § 404.1527(c), commonly known as the "Treating Physician Rule," imposes a duty on the Commissioner to "evaluate every medical opinion we receive." Special consideration is given to the opinions of treating physicians, based on the view that "these sources are likely to be the medical professionals most able to provide a detailed,

longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone or from reports of individual examinations." *Id.* § 404.1527(c)(2). Under some circumstances, the opinions of the treating physicians are to be accorded controlling weight. Even where the opinions of the treating physicians are not accorded controlling weight, the Commissioner is obligated to weigh those opinions in light of a broad range of factors, including the examining relationship, the nature and extent of the treatment relationship, supportability of the opinions in the medical record, consistency, and whether the treating physician is a specialist. *Id.* § 404.1527(c)(1)-(5). The Commissioner is obligated to weigh the findings and opinions of the treating physicians and to give "good reasons" in the written decision for the weight given to a treating source's opinions. SSR 96-2p, 61 Fed. Reg. 34490, 34492 (July 2, 1996). Generally speaking, the Commissioner pledges to give more weight to the opinions of treating and examining providers rather than medical professionals whose opinions are based on chart reviews alone. 20 C.F.R. § 404.1527(c)(1), (2).

## Discussion

Plaintiff was born on March 8, 2001, with a history of his mother having used cocaine while he was in utero. Transcript of Record ("Tr.") at 191, 287, 392. An application for SSI was filed on May 8, 2009, and has now been pending for more than four years. Tr. at 12. The medical record indicates the child has had a history of violent outbursts and tantrums; severe anger; statements of homicidal and suicidal intentions; high anxiety; assaultive behavior on his grandmother, siblings, and peers; one arson episode; and significant difficulties with reading and written expression. Tr. at 283, 339-57, 383-94, 466, 507. Plaintiff has experienced some

academic difficulties and was required to repeat the first grade. He has been treated for a number of years at the Institute of Psychiatry at the Medical University of South Carolina ("MUSC"), including one in-patient hospitalization, and his diagnoses have included Attention Deficit Hyperactivity Disorder ("ADHD"), Oppositional Defiant Disorder ("ODD"), Anxiety Not Otherwise Specified, and Learning Disorder with reading and written expression. Tr. at 283, 350, 357, 393, 412, 435, 452, 474, 495, 507. The child's wild mood swings have also caused his providers at MUSC to suspect an underlying mood disorder, perhaps reflecting early evidence of bipolar disorder. Tr. at 283, 452-53, 474, 493, 520. As one of the child's MUSC therapists explained to a Social Security disability examiner, Plaintiff was thought to have an "organic" impairment "due to in-utero drug exposure," which "essentially makes a kid's brain act bipolar." Tr. at 191. Plaintiff's anxiety diagnosis followed documentation of acute anxiety leading to elopement from school or other activities, shortness of breath, and other signs of anxiety. Tr. at 283, 452, 507.

Despite the child's significant mental health diagnoses and long history of unpredictable and violent behavior, the record also indicates some variability in the intensity of his symptoms and better control of behavior at school and in-patient hospitalization as opposed to his behavior at home and in the community. Tr. at 181-88, 241-48, 301, 418, 435, 451-52, 474, 495, 519, 531, 541-42, 548-49. Further, a comprehensive psychoeducational evaluation conducted by Dr. Kasey Hamlin-Smith, a clinical instructor in pediatrics at MUSC, demonstrated that while Plaintiff has average intelligence, his "achievement scores in the areas of reading and written expression are indicative of specific learning disabilities in these areas." Dr. Hamlin-Smith concluded that "it appears that [the child's] current academic problems are not the result of any

intellectual deficiency, but rather learning disabilities." Tr. at 350.

The record contains varied medical opinions concerning the extent of Plaintiff's impairments. The child's primary treating physician, Dr. Kirk Meekins, a double board certified child and adult psychiatrist at MUSC, has written that Plaintiff's condition has been "resistant to treatment" and the child's impairments "cause significant functional impairment." Tr. at 554. These opinions appear largely endorsed by Dr. Hamlin-Smith, another treating MUSC provider. Tr. at 339-54. Dr. Mark McClain, an examining psychologist, found that the child was "currently exhibiting significant behavioral difficulty in the home and school settings" and endorsed a broad range of mental health diagnoses, including "early onset bipolar disease." Tr. at 520. On the other hand, the record contains the reports of several chart reviewers, all of whom opine that Plaintiff's impairments are not disabling. Tr. at 322-24, 328-33, 375-381, 521-26.[1]

The Administrative Law Judge ("ALJ") found at Step One that Plaintiff had not engaged in substantial gainful activity since May 8, 2009, and found at Step Two that he had severe impairments in the areas of ADHD and ODD. Tr. at 15. The ALJ did not address at Step Two the other diagnoses made by Plaintiff's various treaters, including anxiety, learning disabilities in the areas of reading and written expression, and possible bipolar disease. The ALJ then concluded that Plaintiff did not meet the Listing for ADHD, 112.11, and did not satisfy the equivalence requirements regarding any Listing individually or in combination. Tr. at 15-16. In

---

[1] It is interesting to note that even among the chart reviewers there appears to be some concern about the degree of the child's impairments. One of the chart reviewers, Michael Neboschick, a psychologist, concluded that Plaintiff had a "marked" impairment in "acquiring and using information," relying on the comprehensive evaluation conducted by Dr. Hamlin-Smith at MUSC. Tr. at 377. Another chart reviewer, Dr. Camilla Tezza, also a psychologist, found that the child had a "marked" impairment in "interacting and relating to others." Tr. at 523. A finding of two "marked" impairments entitles the claimant to a finding of disability.

reaching these conclusions, the ALJ gave "little weight" to the opinion of Plaintiff's primary treating physician, Dr. Meekins, because his opinion regarding significant functional impairments was "vague," insufficiently specific, and allegedly inconsistent with the doctor's own treatment notes and other evidence in the record. Tr. at 19. The ALJ also apparently gave little weight to the opinions of Dr. Hamlin-Smith regarding Plaintiff's "serious symptoms or serious impairment in social or school functioning," again claiming the findings were inconsistent with other information in the record. Tr. at 17-18. The testimony of Plaintiff's grandmother, who had raised the child since he was fifteen months old, was also given "limited weight," contending that she was "potentially motivated to help the claimant to obtain monetary support." Tr. at 19. On the other hand, the opinions of the chart reviewers were given "significant" or "great" weight. Tr. at 20. It is from this decision, after denial of review by the Appeals Council, that Plaintiff now appeals.

### A.   Failure to Evaluate Plaintiff's Anxiety Diagnosis, Learning Disabilities, or Possible Bipolar Disorder at Step Two

The ALJ's decision contains a very truncated discussion of Plaintiff's severe impairments at Step Two, addressing only the ADHD and ODD. Tr. at 15. The record is quite clear, however, that various providers diagnosed Plaintiff with Anxiety Disorder NOS (not otherwise specified), and the record is replete with evidence supporting that diagnosis. This includes frequent elopement actions, development of shortness of breath due to anxiety, a fear of death, and other symptoms of an anxiety disorder. Tr. at 283, 350, 357, 393, 435, 452, 493, 507, 519. The failure to address the anxiety diagnosis at Step Two constitutes clear error and, standing alone, requires reversal and remand.

Similarly, the ALJ failed to address at Step Two the diagnosis of learning disabilities by a number of Plaintiff's providers and examiners. Tr. at 339-354, 383, 396, 519. This diagnosis is well supported by the detailed testing conducted by Dr. Hamlin-Smith. There is no explanation in the ALJ's decision regarding his failure to address this diagnosis, which should have been addressed at Step Two.

Further, the record contains significant evidence that the child may have some form of mood disorder, likely early bipolar disorder. Tr. at 191, 283, 474, 519. The treaters at MUSC began voicing their suspicion regarding bipolar disease early in the child's treatment, and Dr. Mark McClain, an examining consultant, noted in his report the child's aggressive behavior and that these "behavioral symptoms" are "consistent with early onset bipolar disorder." Tr. at 520. The ALJ on remand should consider bipolar disease/ mood disorder at the Step Two stage of the analysis.

The failure of the ALJ to address an anxiety disorder, learning disabilities, or a mood disorder at Step Two suggests that he unduly limited the range of Plaintiff's mental health impairments and did not appropriately consider them at Step Two and thereafter in the review process. On remand, the full range of these impairments should be considered by the ALJ.

**B.   Failure to Give Appropriate Weight to the Opinions of Plaintiff's Treating Physicians**

It is notable that the ALJ dismissed the opinions of Plaintiff's treating providers, providing them little weight, and afforded great or significant weight to chart reviewers who had neither examined nor treated the claimant. This, of course, turns the Treating Physician Rule on its head, deferring to the opinions of non-examining and non-treating providers. The basis for

the ALJ's rejection of the opinions of Plaintiff's primary treating physician, Dr. Meekins, is most troubling to the Court since it was based, at least in part, on the "vague" and non-specific nature of his letter of November 23, 2010, in which Dr. Meekins stated that the child has "significant" functional impairments. Tr. at 19, 554.

While the Court agrees with the ALJ that Dr. Meekins' November 23, 2010 letter is not well documented or detailed, this should not end the consideration of what may be the most important opinion in this medical record. Dr. Meekins personally examined the child multiple times, supervised his treatment, and is highly credentialed as a double board certified psychiatrist and assistant professor of child and adolescent psychiatry at MUSC. Tr. at 452-53, 455-56, 473-75, 507-08, 554. Dr. Meekins' opinions would normally be the type which would be entitled to the highest level of deference under the Treating Physician Rule. The regulations in effect at the time this claim was filed and this hearing was conducted mandated that where the information from a treating physician "is inadequate for us to determine whether you are disabled . . . [w]e will first recontact your treating physician . . . to determine whether the additional information we need is readily available." 20 C.F.R. § 404.1512(e)(1).[2] If the ALJ had undertaken an effort to recontact Dr. Meekins, which the record provides no evidence of any such effort, he could

---

[2] This regulation was modified on February 23, 2012, and the requirement of the adjudicator to contact the treating physician was removed. 77 Fed. Reg. 10651 (Feb. 23, 2012). This modification occurred, however, after Plaintiff's claim was filed and this administrative hearing was conducted, and this regulation remains binding on the Commissioner in this proceeding. Further, the Commissioner made clear that despite the removal of the universal requirement to contact the treating physician from the regulation, "we would still expect adjudicators to recontact a person's medical source" when "recontact is the most effective and efficient way to resolve an inconsistency or insufficiency." *Id.* It is not clear to the Court how the ALJ could resolve the issues surrounding Dr. Meekins' opinions more effectively or efficiently than direct contact with him.

have been asked to provide a more detailed basis for his opinions and to address any alleged inconsistency between his opinion and other treatment records.[3]

The Court finds the failure to recontact Dr. Meekins under these circumstances violated the provisions of then-controlling regulatory law and requires the Court to reverse and remand the Commissioner's decision. On remand, the ALJ should communicate with Dr. Meekins in an effort to obtain additional information relating to his opinions.

## Conclusion

Based on the foregoing, the Court hereby **REVERSES** the decision of the Commissioner and **REMANDS** the matter to the agency for further proceedings consistent with this order pursuant to Sentence Four of 42 U.S.C. § 405(g). In light of the protracted nature of these proceedings and the fact that the benefits sought are on behalf of a child, the Commissioner is directed to conduct an administrative hearing and produce a decision of the ALJ within 180 days of this order.

---

[3] The ALJ accurately observes that Dr. Meekins' office notes documented a number of GAF scores of 60 and made reference to the "mild" nature of his symptoms. Tr. at 19. The ALJ contrasted these notes with Dr. Meekins' November 23, 2010 letter, Tr. at 554, which sets forth a far more troubling view of Plaintiff's functional limits. Each of Dr. Meekins' office notes begins with a "History of Present Illness" that changes for each office visit and several of the notes contain quite troubling accounts regarding the child's recent history. Tr. at 452, 455, 473, 507. On the other hand, the "Diagnosis" and "Assessment" sections of the notes, which include the GAF scores and reference to "mild" symptoms, appear to use almost identical language and do not appear to change materially from visit to visit. Tr. at 452-53, 455-56, 474-75, 507. The ALJ should address with Dr. Meekins this internal inconsistency within the office notes and whether the Assessment and Diagnosis sections were simply carried over from visit to visit and not adjusted as Plaintiff's symptoms worsened.

**AND IT IS SO ORDERED.**

_____
Richard Mark Gergel
United States District Judge

Charleston, South Carolina
January 13, 2014